# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JACOB GRATTON, | ) CASE NO. 5:22-CV-01381-DCN |
| Plaintiff, | ) |
| | ) U.S. DISTRICT JUDGE |
| v. | ) DONALD C. NUGENT |
| | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | ) JENNIFER DOWDELL ARMSTRONG |
| | ) |
| Defendant, | ) **REPORT AND RECOMMENDATION** |
| | ) |

## I. INTRODUCTION

Plaintiff Mr. Jacob Gratton ("Mr. Gratton") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Donald C. Nugent has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

On July 17, 2020, Mr. Gratton filed DIB and SSI applications, alleging a disability onset date of December 31, 2019. (Tr. 198-211).[1] These applications were denied initially and upon reconsideration. (Tr. 108-16, 119-25). Mr. Gratton requested a hearing before an administrative law judge ("ALJ"). (Tr. 126-27). On June 9, 2021, an ALJ held a telephonic hearing due to the

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 5 on CM/ECF.

1

COVID-19 pandemic, during which Mr. Gratton, represented by counsel, and a vocational expert ("VE") testified. (Tr. 27-61).

On June 9, 2021, the ALJ issued a written decision finding that Mr. Gratton was not disabled. (Tr. 13-22). The ALJ's decision became final on June 3, 2022, when the Appeals Council declined further review. (Tr. 1-6). Mr. Gratton filed a Complaint on August 5, 2022. (ECF Doc. 1). Mr. Gratton asserts the following assignment of error:

> (1) The Administrative Law Judge's finding that Plaintiff retained a residual functional capacity for a range of unskilled work at all exertional levels is not supported by substantial evidence.

(ECF Doc. 6, PageID#611).

### III. BACKGROUND INFORMATION

#### A. Personal, Educational, and Vocational Experience

Mr. Gratton was born in 1993, and he was 26 years old on the alleged disability onset date. (Tr. 20). He is not married and lives alone. (Tr. 34). He has a high school education and completed "some college." (Tr. 34-35). At the time of the hearing, he had a driver's license and was working as a pizza maker. (Tr. 35). He previously worked as a line cook at Dave and Buster's. (Tr. 36).

#### B. Relevant Hearing Testimony

##### 1. *Mr. Gratton's Testimony*

Mr. Gratton testified that at the time of the hearing, he was working as a pizza maker. (Tr. 35). Prior to that, he worked 12-hour shifts as a line cook at Dave and Buster's for over five months. (Tr. 36). He stated he quit this job because his managers made him wash dishes rather than doing jobs related to a line cook's duties. (*See* Tr. 48-49). He testified that he got along "really well" with his coworkers and supervisors and that he did not have complaints for "most of the time." (Tr. 49).

Mr. Gratton testified that he became disabled in December 2019, when he started "having issues with … [his] mental health and [he] ended up in the hospital for a little bit." (Tr. 41). When asked why Mr. Gratton thought he could not work full time, Mr. Gratton responded, "[C]urrently, I think that I can [work full time.]" (*Id.*). However, he testified that he and his counsel were arguing that he was unable to work when he was experiencing mental health issues because he was "nowhere in…the right mental state to be able to do that." (Tr. 42).

Mr. Gratton also testified that he was not taking medication. (Tr. 42). Although his counselor did not recommend medication, Mr. Gratton's psychiatrist did so. (*Id.*). However, Mr. Gratton stopped taking the medication because "[he] wanted to get to this point that [he] knew God could heal [his] mind." (*Id.*).

Mr. Gratton described his normal day to the ALJ. (Tr. 42-43). He testified that he receives help with his laundry from his mother and father because he does not have a washer and dryer at his apartment. (Tr. 43). When asked by the ALJ whether he had people aid with any other tasks, he testified "not really, no." (*Id.*). Yet, upon questioning from his counsel, Mr. Gratton testified that his dad also comes over once a week to "kind of help around if some things need done" but he usually tries to keep up those tasks "to the best of [his] ability," and that those tasks are "[his] responsibility." (Tr. 50). He also testified that his father helps him with the dishes and his laundry "just kind of randomly." (*Id.*).

### 2. *Vocational Expert's Testimony*

The vocational expert ("VE") testified that Mr. Gratton had past relevant work as a telemarketer, stores laborer, fast food cook, pizza deliverer, kitchen helper, and cashier-checker. (Tr. 54-55). The ALJ asked whether a hypothetical individual with Mr. Gratton's age, education, and work experience that had the nonexertional limitations of performing simple, routine, and

3

repetitive tasks, but not at a production rate pace; occasional interaction with supervisors and coworkers; no interaction with the public; and tolerating few changes in a routine work setting could perform past work. (Tr. 55). The VE opined that this individual could perform Mr. Gratton's past work as a stores laborer and kitchen helper. (Tr. 56). The VE additionally opined that this individual could perform other work as a floor waxer, merchandise marker, and mail sorter. (*Id.*).

Mr. Gratton's counsel asked the VE at what point an individual being absent becomes work preclusive in an unskilled work environment. (Tr. 57). The VE testified that it "really depends on the business sector." (*Id.*). In the industrial sector, the VE opined that an individual could not miss any time during an introductory or probationary period (typically 90 days in duration) and no more than one day per month after this probationary period. (*Id.*). The VE opined that in other sectors such as government, office type jobs, warehousing, and retail, an individual can miss one day per month during a typical 90-day introductory period. (*Id.*). The upper threshold for absences would be one and a half days per month thereafter. (*Id.*). The VE testified that an individual missing two days or more per month on a regular and ongoing basis would be work-preclusive. (Tr. 57-58).

Mr. Gratton's counsel also asked the VE at what point an individual being off-task becomes work preclusive in the unskilled work environment. (Tr. 58). The VE opined that an individual can be off-task no greater than 14% of the work day in order to maintain employment in the national economy. (*Id.*).

## C. Relevant Non-Medical/Medical Opinion Evidence

On October 8, 2020, Dr. Karen Terry, Ph.D. (a state agency reviewing psychologist) reviewed the medical record at the initial level of consideration. (Tr. 68). Dr. Terry opined that Mr. Gratton can relate superficially and minimally with others when he chooses to, but he would perform optimally in a more solitary work setting that does not require collaborative efforts with

4

others for task completion, to interact with the general public, and no more than infrequent and superficial interaction with coworkers and supervisors. (Tr. 70). Dr. Terry further opined that Mr. Gratton should not be placed in a position where he has to be involved in conflict management situations. (*Id.*). Dr. Terry also found that Mr. Gratton retains the ability to perform routine job duties that remain static and are performed in a structured, stable, predictable work setting that does not undergo frequent change, and where any necessary changers occur infrequently and can be adequately and easily explained to him ahead of time. (Tr. 71). The ALJ finally opined that Mr. Gratton may need occasional flexibility with changing break times when he is experiencing "more increased psychiatric symptoms." (Tr. 71).

On December 29, 2020, Dr. Paul Tangeman (a state agency reviewing psychologist) reviewed the medical record at the reconsideration level. (Tr. 90). After reviewing additional evidence such as Mr. Gratton's therapy notes from October, November, and December 2020, Dr. Tangeman agreed with Dr. Terry's opinion. (Tr. 90).

### D. Relevant Medical Evidence

On April 17, 2020, a licensed social worker from Coleman Crisis Services visited Mr. Gratton's residence because one of Mr. Gratton's providers believed Mr. Gratton "need[ed] to be hospitalized" as he had recently been diagnosed with schizophrenia and his family members were concerned for his safety (Tr. 331). His mental status examination revealed resistant, mistrustful, and withdrawn demeanor; intense stare; avoidant eye contact; pressured speech; flat affects; thought content with delusions and hallucinations; and poor/fair insight and judgment. (Tr. 339-40). Mr. Gratton refused the social worker's help. (Tr. 331). The social worked noted that Mr. Gratton "appeared to be caring for himself, was oriented … and had the necessities in the home

such as food, clothing, furniture, and all utilities. [He] appeared to be relatively stable and remained in the community." (*Id.*).

On May 2, 2020, Mr. Gratton returned to Coleman due to "intrusive paranoid thoughts of different things such as death, religion, demons, feeling hopeless, and helpless.'" (Tr. 342). He reported increased flashbacks of his history of sexual abuse. (*Id.*). He denied symptoms of disturbed reality or psychosis, but the social worker observed "odd beliefs, suspicious ideation, and a grandiose sense of self." (Tr. 344). Mr. Gratton believed that he was a "contact for his God" and that he was in communication with God regularly. (*Id.*). His mental status examination revealed cooperative behavior, normal eye contact, clear speech, flat affect, logical thought process, and impaired attention and concentration. (Tr. 355-56). Mr. Gratton was admitted and started on Zyprexa, an antipsychotic drug used to treat schizophrenia and bipolar disorder. (Tr. 371).

On May 3, 2020, Mr. Gratton met with Dr. Todd T. Wilke, M.D. for an initial psychiatric visit and intake to Coleman's crisis stabilization unit. (Tr. 359-64). Mr. Gratton had been "voicing more delusional ideas" and believed that "there are demons that are preventing him from sleeping." (Tr. 359). He reported that he had "a long history of abusing hallucinogens" but "has actually been clean for 4 ½ months." (*Id.*). Mr. Gratton reported his symptoms had worsened since he quit using hallucinogens, and Dr. Wilke suggested that may be due to the hallucinogens inducing sleep. (*Id.*). Mr. Gratton's mental status examination findings included euthymic and restricted mood and affect, tangential and circumstantial thought process, abnormal associations, delusions, and hallucinations. (Tr. 361). His diagnoses were unspecified schizophrenia spectrum and other psychotic disorder. (Tr. 362). His provisional diagnosis was PTSD. (Tr. 363). Mr. Gratton was prescribed Zyprexa. (*Id.*).

6

On May 5, 2020, Mr. Gratton saw a nurse practitioner for a telephonic psychiatric visit. (Tr 365-70). Mr. Gratton had refused take Zyprexa since it was prescribed but agreed to take it on that day. (Tr. 365). He wanted to leave the crisis stabilization center, but he agreed to continue treatment after staff intervention. (Tr. 365). He reported feeling "weird and helpless" and "like he lost connection to God." (*Id.*). He reported seeing demons that "keep tormenting his mind" and having constant intrusive thoughts. (*Id.*). Mr. Gratton's mental status examination revealed that he was calm, cooperative, and had normal psychomotor activity, tangential and circumstantial thought process, abnormal associations, delusions, and hallucinations. (Tr. 367-68).

On May 7, 2020, Mr. Gratton said that he wanted to leave the crisis stabilization unit because he felt "the [H]oly [S]pirit" was telling him to do so. (Tr. 318-21). The notes indicated Mr. Gratton was "religiously pre-occupied" and had mistrustful and withdrawn demeanor and behavior. (Tr. 318). He had avoidant eye contact, pressured speech, flat affect, circumstantial thought process, and delusions. (Tr. 318-19). He continued counseling services and medication use because he felt the medication was helping. (Tr. 319, 321).

On May 11, 2020, Mr. Gratton reported "doing pretty" good and was described as compliant. (Tr. 377). His anxiety and depression were manageable, his sleep and appetite were good, his mood was stable, and his mind was clear. (*Id.*). He also reported rare hallucinations on medications. (*Id.*). Mr. Gratton was discharged that day, nine days after his admission to the crisis stabilization unit. (Tr. 381).

On May 15, 2020, Mr. Gratton began care at Phoenix Rising Behavioral Healthcare. (Tr. 397). The intake notes indicated that Mr. Gratton had been diagnosed with schizophrenia when he was 18 years old, but he had not received treatment for the past four years. (Tr. 397). He began psychotherapy, but he did not continue treatment at Phoenix Rising. (Tr. 386-94).

7

On May 19, 2020, Mr. Gratton participated in a telephonic psychotherapy session. (Tr. 392-96). The treatment notes indicated that Mr. Gratton was anxious, but he had motivated mood and affect. (Tr. 393). He reported hearing voices and having hallucinations. (Tr. 393). He reported that he had "thought streams" and "mind loops." (*Id.*). He also reported hearing "Christ voices that could be normal or natural" and seeing "shadow people." (*Id.*).

On May 26, 2020, Mr. Gratton participated in a telephonic psychiatric diagnostic evaluation. (Tr. 386-91). He described making good progress since staying at his parents' home. (Tr. 387). His mental status examination revealed anxious mood, constricted affect, paranoid thought content, delusions, partial insight, and moderately impaired ability to make reasonable decisions. (Tr. 388-89).

On June 30, 2020, Mr. Gratton returned to Coleman for a psychiatric diagnostic assessment. (Tr. 453). His mother stated that he was very frustrated and "need[ed] to be on disability" and that "[h]e can't handle working more than 30 hours per week." (Tr. 453). Mr. Gratton reported having some inattention but denied impulsivity and disturbed reality. (Tr. 457). His mental status examination findings showed agitated and resistant demeanor/behavior, pressured speech, and difficulty paying attention at times due to being distracted, and poor insight and judgment. (Tr. 461-62). Mr. Gratton requested case management and vocational services in the future but declined psychiatry or counseling. (Tr. 472).

On August 4, 2020, Mr. Gratton saw Edward E. Dickerhoof, LPCC-S, a counselor. (Tr. 515-17). Mr. Gratton cited "the historical connection in biblical times between witchcraft and drugs" as the reason he had mostly refused medication, but he seemed to have some openness to medication if he was able to get past this belief. (Tr. 515). His symptoms were described as vivid dreams and nightmares, as well as thinking poorly of himself. (*Id.*). He had dysthymic, anxious,

8

and restricted mood and affect. (*Id.*). He had hyper-focused, hypervigilant, sometimes tangential thought process and orientation but was fully oriented. (Tr. 516).

On August 17, 2020, Mr. Gratton saw his counselor again. (Tr. 511-12). He complained of anxiety, depression, guilt, and shame. (Tr. 511). His thought content was described as "obsessive fear that he had committed the unpardonable sin by blaspheming the Holy Spirit." (*Id.*). His friends and family tried to console him but had been of "little help." (Tr. 512). His counselor suggested that his condition might be a medical condition rather than "simply a spiritual condition." (*Id.*). Mr. Dickerhoof noted that while Mr. Gratton understood his schizophrenia diagnosis, he "still doubts its reality." (*Id.*). Mr. Dickerhoof encouraged Mr. Gratton to consider medication, to which Mr. Gratton was slightly receptive. (*Id.*).

On August 25, 2020, Mr. Gratton reported constant worries about his relationship with God and "living up to the required obedience." (Tr. 510). His counselor observed that Mr. Gratton "had desired to talk philosophically/biblically but there was clearly a psychotic component in this obsession." (*Id.*). Mr. Gratton indicated he was willing to set up a consultation with a physician and an appointment was set up.

On August 31, 2020, Mr. Gratton reported doing "slightly better" and discussed his childhood sexual abuse. (*Id.*). Treatment notes reflected that he was "more open to the fact that this trauma could be impacting him in a physical way and that is not all spiritual or demonic." (Tr. 510).

On September 9, 2020, Mr. Gratton saw Dr. Mark Snavely, M.D. (Tr. 512-14). Mr. Gratton made it clear that he did not want to take medication but felt "pressured to be [there] by his family." (Tr. 512). He acknowledged several "unusual thoughts" related to "spiritual themes, demonic possession, and the occult" but was "quite vague and evasive regarding these." (*Id.*). Mr. Gratton's

9

father reported that Mr. Gratton for years had experienced "a variety of non-reality based thinking about spiritual factors, and at times will be seen responding to internal stimuli, and talking back to the 'voices in his head.'" (Tr. 513). His father also stated that Mr. Gratton's family would be no longer willing to interact with Mr. Gratton "in this condition." (*Id.*). Dr. Snavely diagnosed Mr. Gratton with chronic depression with anxiety, psychotic symptoms of "unclear significance," possible OCD, and substance use disorder in early remission. (Tr. 514). He noted that the "differential diagnosis for this presentation certainly would include a form of schizophrenia or schizoaffective disorder, as well as substance induced psychosis, substance-induced persisting, psychotic disorder, and OCD." (*Id.*). The doctor recommended medication, which Mr. Gratton refused. (*Id.*). Dr. Snavely noted that Mr. Gratton appeared to be denying he has any mental illness and attributed his symptoms to "spiritual matters." (*Id.*).

On September 23, 2020, Mr. Gratton visited his counselor and requested a letter "exempt[ing] [him] from the work requirement to get food stamps." (Tr. 506). Although Mr. Gratton wanted to work, he wanted to be able to keep his food stamps "if he is unable to work." (*Id.*).

On October 1, 2020, Mr. Gratton was calm and relaxed, had full and congruent affect, and was conversational. (Tr. 528). He was coherent, alert, and fully oriented, and had improving function. (*Id.*). He reported setting up regular spiritual counseling appointments with his pastor. (*Id.*). He reported no longer feeling like he lost his salvation or blasphemed God. (*Id.*). His counselor noted that Mr. Gratton was "still very scrupulous about his faith and behavior but there [was] less obsession." (*Id.*).

On October 28, 2020, Mr. Gratton reported excitement and anxiety over getting a job as a cook at Dave and Busters. (Tr. 525). He shared his "current obsession and belief that as a Christian he should be obeying all of the Jewish customs and all of the Old Testament laws." (*Id.*).

On November 19, 2020, Mr. Gratton was "in a good mood and fairly enthusiastic." (Tr. 522). He reported reading "some of the Christian classics instead of the online conspiracy theories." (*Id.*). His functioning was described as "improved," and he was working at Dave and Busters as a line cook and "putting a lot of hours." (*Id.*). His counselor observed that Mr. Gratton was in a good mood and fairly enthusiastic. (*Id.*).

On December 16, 2020, Mr. Gratton reported "doing really well with minimal depression." (Tr. 535). He reported "spiritual fulfillment through listening to music and has been able to share his kindness and faith with a few people, which makes him very happy." (*Id.*). He reported feeling "some sense of calling into a music ministry" and planned to work toward learning how to play the guitar. (*Id.*). His counselor observed that Mr. Gratton's thoughts were linear and there were no psychotic symptoms during the session (*Id.*). The mental status examination revealed Mr. Gratton was calm and euthymic with full and congruent affect and no noticeable psychosis during the session. (*Id.*). He reported ongoing sobriety. (*Id.*).

On December 30, 2020, Mr. Gratton reported "having a good Christmas" with his family while he continued to work. (Tr. 560). He reported "growing spiritually and feeling more spiritual peace." (*Id.*). He reported being "much more clear minded" and that working, reading his Bible, and spending time with his family have been "very positive" influences. (*Id.*).

On January 6, 2021, Mr. Gratton's mental status examination revealed that he was calm and coherent with good insight and judgment and improving functioning. (Tr. 562). Because he picked up an extra shift at work, Mr. Gratton had only a thirty-minute counseling session. (*Id.*).

11

He reported considering going to Colorado to a school where he could learn "to lead worship music." (*Id.*).

On February 10, 2021, Mr. Gratton reported that he was "working a lot which has been good for his mental health" and that he "found [working] empowering and it has given him something to do." (Tr. 564). He showed no signs of psychotic behavior or odd thoughts. (Tr. 564). His mental status examination showed that Mr. Gratton was euthymic with full and congruent affect, no signs of delusions or psychosis, and continued sobriety. (*Id.*).

On March 10, 2021, Mr. Gratton reported "continual improvement" and said that he was "working a lot and having good social interactions." (Tr. 566). He reported that he had been able to avoid "some of the conspiracy theories and things that caught his attention before." (*Id.*). He returned to the church his family attends. (*Id.*). His thoughts were described as "clear and sensible," and he showed "reasonable concern for others." (*Id.*). His mental status examination indicated that Mr. Gratton was euthymic, alert and fully oriented, coherent, with no current or recent reported psychosis. (*Id.*). He maintained abstinence from drugs and alcohol. (*Id.*).

On April 21, 2021, Mr. Gratton was late to his session because of "vivid dreams and being unable to sleep well" the night before. (Tr. 567). There were "no significant changes" from his prior mental status examination in March 2021. (*Id.*). He reported "being online with a lot of people who [were] talking about spiritual things, and he said that the conversation turned really dark." (*Id.*). He reported "working a lot and picking up another job." (*Id.*).

IV.  **THE ALJ'S DECISION**

In her June 2021 decision, the ALJ determined that Mr. Gratton had not engaged in substantial gainful activity since December 31, 2019. (Tr. 15). She further determined that Mr. Gratton had the following severe impairments: posttraumatic stress disorder ("PTSD");

12

depression; and schizophrenia. (Tr. 16). However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ also determined that Mr. Gratton could perform a full range of work at all exertional levels with the following nonexertional limitations: is capable of performing simple, routine, and repetitive tasks but not at a production rate pace; able to interact with supervisors, co-workers, and the public occasionally; and able to tolerate few changes in a routine work setting. (Tr. 17). The ALJ next found that Mr. Gratton is capable of performing past relevant work as a Laborer and Kitchen Helper. (Tr. 20). She further found that the work does not require the performance of work-related activities precluded by Mr. Gratton's residual functional capacity. (*Id.*). Accordingly, the ALJ determined that Mr. Gratton was not disabled. (Tr. 21).

V. **LAW AND ANALYSIS**

A. **Standard of Review**

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

13

234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether

14

the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. Analysis

Mr. Gratton argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to identify evidence supporting disability and cited only generally to the record as a whole (*i.e.*, "cherrypicked" the record). (ECF Doc. 6, PageID#612-14). Specifically, Mr. Gratton asserts that the ALJ ignored evidence noting psychosis, delusions, difficulty paying attention, poor insight, and poor judgment, which would have supported Mr. Gratton's assertion that he is incapable of sustaining full-time, competitive employment at any exertional level due to being off-task or absent at excessive levels. (*See id.*). For the following reasons, I disagree.

Mr. Gratton's "cherry picking" argument is not well-taken. An ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications."). Yet, "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies

15

unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10-cv-1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011). The Sixth Circuit has explained that allegations of cherry picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)).

Moreover, it is well settled that an ALJ need not discuss every piece of evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ makes explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts."). Mr. Gratton contends that the ALJ cherrypicked the record because he failed to "identify the evidence which would support disability." (ECF Doc. 6, PageID#612). In support of this argument, he points to evidence between May to September 2020 documenting noting psychosis, delusions, difficulty paying attention, poor insight, and poor judgment. (*Id.* at PageID#612-14).

Although the ALJ did not discuss the specific pieces of the evidence cited by Mr. Gratton, a review of the ALJ's decision reveals that the ALJ acknowledged, rather than ignored, evidence demonstrating that Mr. Gratton experienced significant mental health problems from psychosis. (*See generally* Tr. 18-19). Specifically, the ALJ found that Mr. Gratton's "statements about the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 18). In particular, the ALJ observed that in May 2020, Mr. Gratton reported disturbing "visions" of demons and flashbacks of childhood trauma, auditory hallucinations of name-calling and visual

16

hallucination of flashes of lights. (Tr. 18; *see* Tr. 323). During his examination, Mr. Gratton showed several delusions evidenced by having religious preoccupations and stated that he was in a cult and felt "good energy" coming from his counselor. (Tr. 18; *see* Tr. 323). His mental status examination revealed that Mr. Gratton had average and cooperate demeanor, avoidant eye contact, clear speech, normal affect, and logical thought process. (Tr. 18-19; *see* Tr. 318-19, 322-23).

After being discharged, Mr. Gratton attended outpatient counseling services on May 26, 2020, where he continued to report delusions. The ALJ noted that Mr. Gratton discussed that he was having voices, "thought streams," and "mind loops. (Tr. 19; *see* Tr. 386-87). His mental status examinations revealed anxious mood with constricted affect, tangential thought process, normal perception, paranoid thought content, normal cognition, average intelligence, persecutory delusions, and denial of hallucinations and suicidal ideation/thoughts. (Tr. 19; *see* Tr. 388-89, 397, 401). The ALJ also observed that in September 2020, Mr. Gratton asked for a letter exempting him from work due to psychosis and anxiety. (Tr. 19; *see* Tr. 506).

The ALJ discussed evidence cutting against Mr. Gratton's allegations later in the relevant period. For example, the ALJ noted that in December 2020, Mr. Gratton's mental status examination described him as calm and euthymic with full and congruent affect and no noticeable psychosis during the counseling session. (Tr. 19; *see* Tr. 535). Dr. Dickerhoof described Mr. Gratton's thoughts as linear and further observed that there were no psychotic symptoms during the session. (Tr. 19; *see* Tr. 535). Finally, the ALJ observed that in March 2021, Mr. Gratton reported "continual improvement" and that he had been working "a lot and having good social interactions." (Tr. 19; *see* Tr. 566). Mr. Gratton reported to his provider that he had been able to avoid some of the conspiracy theories and things that caught his attention before. (*Id.*). Instead of conspiracy theories and related matters, Mr. Gratton indicated that he returned to the church his

17

family attended. (*Id.*). His provider noted Mr. Gratton's thoughts were clear and sensible and that he showed reasonable concern for others. (*Id.*).

In sum, Mr. Gratton's cherry picking argument is not well-taken because the ALJ considered all the evidence the record—both favorable and unfavorable—in her decision. Mr. Gratton identifies portions of the record that he asserts would have supported a more restrictive RFC than found by the ALJ. But as even Mr. Gratton concedes, the "law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC." *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation* adopted, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

Further, the ALJ discussed evidence documenting Mr. Gratton's mental health problems from the early part of the relevant period and also highlighted evidence demonstrating improvement from the later part of the relevant period. Significantly, the ALJ's discussion of the evidence demonstrates that Mr. Gratton, despite his allegations, reported "doing really well with minimal depression" in December 2020 (Tr. 19; *see* Tr. 535, 560), and having "continual improvement" and working "a lot and having good social interactions" in March 2021 (Tr. 19; *see* Tr. 566). This evidence (and the other evidence discussed above) is substantial evidence supporting the ALJ's RFC determination. So long as the ALJ provides substantial evidence in support of his conclusion, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position [.]" *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The court's role in considering a social security disability appeal is not to try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).

Finally, Mr. Gratton makes a one-sentence argument, without citation to any case law, that the ALJ erred at Step Five because the VE testified that an individual missing two days or more per month on a regular and ongoing basis or an individual being off-task greater than 14% of the work day would eliminate all jobs. (ECF Doc. 6, PageID#614). Because Mr. Gratton fails to adequately raise this issue on appeal and fails to address it anything other than a perfunctory manner, this argument is deemed waived. *McPherson v. Kelsey*, 125 F.2d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to…put flesh on its bones."). Accordingly, I recommend that Mr. Gratton's assignment of error be rejected because it lacks merit.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Mr. Gratton's assignment of error and AFFIRM the Commissioner's decision.

Dated: July 24, 2023
                                                s/ *Jennifer Dowdell Armstrong*
                                                Jennifer Dowdell Armstrong
                                                U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

>objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).